IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAUL A. LEWIS,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )          1:12CV1189
                                        )
SLOAN D. GIBSON,                        )
Acting Secretary of Department          )
of Veterans Affairs,                    )
                                        )
                    Defendant.          )
_____ )

## MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on Defendant Acting Secretary of the Department of Veterans Affairs Sloan D. Gibson's ("Defendant") Motion for Summary Judgment [Doc. #28]. Also before the Court is *pro se* Plaintiff Paul A. Lewis's ("Plaintiff") Motion for Summary Judgment [Doc. #33]. Plaintiff's Amended Complaint [Doc. #13] asserted that Defendant violated the Americans with Disabilities Act and the Rehabilitation Act by denying his request for reasonable accommodation and by allegedly retaliating against Plaintiff by terminating his employment based upon his filing a complaint with the Equal Employment Opportunity Commission. Defendant denied these allegations and argues that summary judgment is proper because, as a matter of law, Defendant did not discriminate or retaliate against Plaintiff on account of his disability. For the reasons discussed below, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## I.    FACTS AND PROCEDURAL BACKGROUND

The undisputed facts are as follows, with relevant disputes of fact noted.  Plaintiff asserts that he suffers from a variety of disabilities, the main ones of which are learning disabilities, dyslexia, concentration problems, attention deficit disorder ("ADD") and attention deficit hyperactivity disorder ("ADHD").  Plaintiff believes he has been afflicted with these disabilities his entire life, although he first became aware of them when he was tested in college.

Plaintiff began working for the Department of Veterans Affairs with the Durham Veterans Administration Medical Center ("Durham VAMC") in 2003 as a career intern.  After approximately two years as an intern, the Durham VAMC hired Plaintiff into its Human Resources Department as a Human Resources Specialist ("HR Specialist").  Plaintiff continued working as a HR Specialist until his employment was terminated in August of 2011.  Early on in his work as a HR Specialist, Plaintiff received positive performance reviews and promotions.

Odessa Wright ("Wright") served as Plaintiff's supervisor from his initial employment in 2003 until January 2010.  Wright noted that while she was Plaintiff's supervisor, she sometimes would spend extra time assisting him with tasks.  She also recalled Plaintiff complaining about some difficulties logging on to his computer.  In 2007, Plaintiff informed Wright that he had a disability.  Wright only recalls that Plaintiff "mentioned . . . that he had a disability, but he did not tell me the type of disability that he had nor did he provide any paperwork concerning his disability at that time."  (Wright Decl. [Doc. # 29-3], at ¶ 11.)  Plaintiff testified that Wright told him she did not believe that he had a disability, and that she directed him to obtain medical documentation.  (Lewis Dep. [Doc. #29-2], 45:2-6.)  Plaintiff apparently did not provide such

documentation until 2009, when former Chief of Human Resources Management Services ("Chief of HR") Zetta M. Ferguson ("Ferguson") requested medical documentation of Plaintiff's learning disabilities. In response, Plaintiff submitted a neuropsychological evaluation from 2008 that Plaintiff obtained regarding his need for testing accommodations in order to take the LSAT and to attend law school. Despite providing the Durham VAMC with verbal information and some medical documentation of his learning disabilities during the period of 2007 through 2009, Plaintiff continued to perform well at work and did not request reasonable accommodations at this time. When Ferguson left the Durham VAMC in 2010, Willette Yarborough ("Yarborough") replaced her as the Interim Chief of HR. In papers left by Ferguson, Yarborough discovered the medical records Plaintiff had provided Ferguson regarding his disabilities. Yarborough returned the documents to Plaintiff, who still at that time had not made any request for reasonable accommodation at this time.

The year 2010 was a pivotal year for Plaintiff and his experiences at the Durham VAMC. In addition to Yarborough taking on the role of Chief of HR in 2010, Christina Leach ("Leach") replaced Wright as Plaintiff's direct supervisor around April of 2010. In May 2010, Leach met with Plaintiff to review the performance standards applicable to his position as part of his mid-year review. The work performance of Durham VAMC employees is evaluated according to particular "elements" and corresponding "performance standards." The Department of Veterans Affairs defines a performance element "as a component of a position that is sufficiently important to warrant written appraisal." (Ex. E1A to Leach Decl. [Doc. #30-2], at 1.) A position typically has four or five such elements, some of which may be designated "critical." In turn,

written performance standards accompany each element. The performance standards define "the fully successful level of achievement" for the corresponding performance element. (Id.) As it relates to Plaintiff's position, the performance elements for the HR Specialist position are Customer Service, Recruitment, Technical Advice and Assistance, HR Specialist Functions, and HR Administration. The first three, that being Customer Service, Recruitment, and Technical Advice and Assistance, are considered "critical elements." During the May 2010 meeting with Leach, Plaintiff did not communicate any concerns or confusion about these elements and performance standards. He informed Leach that he had some learning disabilities, but he did not make any requests for reasonable accommodations at this time. However, Plaintiff highlights that his former assistant, Ava Tinch ("Tinch") was out of the office on various forms of leave for most of the year in 2010. Plaintiff asserts that Tinch's absence placed more work pressure on him and that when Tinch ultimately left the Durham VAMC, she left behind a backlog of work.

Between Plaintiff's May 2010, mid-year progress review and August 2010, Plaintiff's performance slipped. Leach observed that Plaintiff's performance fell below the applicable performance standards for his position. On August 9, 2010, Leach notified Plaintiff of his unsatisfactory performance regarding the critical elements of Customer Service, Recruitment, and Technical Advice and Assistance and placed him on a Performance Improvement Plan ("PIP") to address these shortcomings. Leach provided Plaintiff with a memorandum articulating the specific areas in which his performance was unsatisfactory with particular examples of why his performance was deemed unacceptable. The memorandum also explained that Leach would

4

work with Plaintiff for the next 90 days to improve his performance.  Plaintiff was given until November 6, 2010, to attain acceptable performance levels.

In this August 9, 2010, memorandum, Leach specifically invited Plaintiff to share with her any personal or medical issues that were affecting his work performance.  Specifically, she stated that "[i]f you have any problems of a personal or medical nature which you believe are impinging on your ability to perform successfully, I urge you to bring this information to my attention, as well, so that appropriate assistance may be considered."  (Ex. E3 to Leach Decl. [Doc. #30-5], at 4.)  The memorandum also cautioned that "in the event you do not demonstrate acceptable performance during this opportunity period or, upon attaining acceptable performance, fail to sustain successful performance for a one-year period, action to demote or separate you may result without benefit of additional opportunity to improve." (Id.)  In an August, 2010, meeting Plaintiff "mentioned to [Leach] and Willette Yarborough that he had a disability," but Plaintiff "did not request a reasonable accommodation in August 2010."  (Leach Decl. [Doc. #30-1], at ¶ 6.) Plaintiff received a letter from Acting Chief of HR Yarborough on August 19, 2010, informing him that his within-grade salary increase was being withheld due to his unsatisfactory performance.

During the time period of Plaintiff's PIP, Leach met with Plaintiff weekly to "discuss his completed work, work in progress, and to prioritize assignments that he had." (Id. at ¶ 5.)  On December 3, 2010, Leach informed Plaintiff in a memorandum that he successfully completed the PIP, and he received a "Fully Successful" rating for the three critical elements that were the subject of the PIP.  Plaintiff also received his within-grade salary increase.  This December 3,

2010, memorandum nevertheless again warned Plaintiff that if, "upon attaining acceptable performance, [you] fail to sustain successful performance for a one-year period, action to demote or separate you may result without benefit of additional opportunity to improve." (Ex. E5 to Leach Dec. [Doc. #30-7].)

Hilda Cobb ("Cobb"), one of Plaintiff's HR Specialist coworkers, left the Durham VAMC in January 2011, and Plaintiff was assigned a portion of her workload. The record indicates that to some degree, all HR Specialists were taking on additional work during this time due to fewer Human Resources Assistants, budget difficulties, and greater automation in certain aspects of the HR Specialist position. Also in January of 2011, Jerry Freeman ("Freeman") became Chief of HR. Freeman reported that "[f]rom January – April 2011, I was receiving complaints from Service Chiefs and Assistant Chiefs related to the service being provided by [Plaintiff]." (Freeman Decl. [Doc. #29-17], at ¶ 13.) Leach likewise observed an influx of a variety of complaints regarding Plaintiff's performance during this time period, noting that the "number of complaints concerning Mr. Lewis' performance exceeded the total number received for all of the HR Staffing Specialists combined." (Leach Decl. [Doc. #30-1], at ¶ 10.)

On April 1, 2011, the Durham VAMC switched to a new automated recruitment system for its recruitment needs. The new system, USA Staffing, was intended to streamline the recruitment processes. Human Resources staff was trained on the new program, but the Durham VAMC experienced difficulties in transitioning to this new program. Plaintiff struggled with implementation of USA Staffing more so than other employees, and as a result, other Durham VAMC employees posted job announcements for Plaintiff on the new system. Freeman also

assigned another employee to "sit with [Plaintiff] for an afternoon in mid-April to walk him through an announcement process." (Freeman Decl. [Doc. #29-17], at ¶ 13.) Defendant asserts that both Leach and Freeman met with Plaintiff between January and May 2011, alerted him to the complaints being filed regarding his service, and discussed Plaintiff's performance standards with him. Leach stated she "would work with him on prioritizing assignments, assisted him in locating reference materials so that he could provide accurate Human Resources advice and information to customers, and I often sat with him when he needed additional assistance." (Leach Decl. [Doc. #30-1], at ¶ 10.) In contrast, Plaintiff stated that he received no oral or written warnings during this time.

On May 24, 2011, Plaintiff for the first time filed a formal request for reasonable accommodation. In his request, Plaintiff stated that he had struggled in his position since October 2003, that he had been "hospitalize[d] twice due to the stress of the position," that he had seen multiple doctors, and that he was "expected to perform the duties of three employees," meaning his own job, his former assistant Tinch's responsibilities, and part of Cobb's work . (Ex. D6 to Freeman Decl. [Doc. 29-24], at 1.) Plaintiff stated he was applying for accommodations due to the stress associated with his job. He further stated that the stress prevented him from being able to perform at the levels expected of him. Plaintiff's request for accommodation stated that he had "been screamed, cursed at, and made to feel stupid because I was unable to comprehend at the same level as everyone else." (Id.) Plaintiff made three generic accommodation requests: (1) "Change Performance Standards," (2) "Modify Workload," and (3) "Assistant." (Id. at 2.) Plaintiff simply listed these broad requests and did not provide any

additional details or further specify the meaning of his requests. He listed "Medical Disability" as his reason for the request. (Id.) Again, this was done without providing very much detail about his "medical disability."

Plaintiff, however, did submit his 2008 medical records regarding testing and education with his request for reasonable accommodation. Odessa Wright, Plaintiff's former supervisor, was the Equal Employment Opportunity Manager at the Durham VAMC in 2011. After reviewing Plaintiff's request, Wright informed Plaintiff that he needed to obtain more medical documentation.[1] "The medical documentation [provided with the Reasonable Accommodation Request] did not provide . . . the information . . . needed to know what accommodation would be necessary in the workplace." (Freeman Decl. [Doc. #29-17], at ¶ 10.) Wright also discussed potential alternative accommodations in the event his requested accommodations were not feasible. Specifically, she discussed with him a possible reassignment to a different area, moving to a different location, or changing to a position with a lower salary grade. Plaintiff, however, was not interested in any of the suggested accommodations. Instead, Plaintiff expressed interest in a Chaplain position or Patient Advocate position, but no such openings existed at the Durham VAMC during this time period. On August 5, 2011, Freeman denied Plaintiff's own accommodation request "because the accommodation would require removal of an essential function of the job, the medical documentation that Mr. Lewis provided was not adequate, the accommodation would require lowering of a performance or production standard and the

---

[1]Plaintiff did not secure such medical documentation until the end of July 2011 and early August 2011, and he did not submit this documentation to Defendant until after his request was denied and after he was discharged from his employment.

accommodation would cause an undue hardship." (Id. at ¶ 18; Ex. D26 to Freeman Decl. [Doc. #29-44], at 1.)

Meanwhile, less than two weeks after filing his Request for Reasonable Accommodation, Plaintiff contacted the Office for Resolution Management for Equal Employment Opportunity ("EEO") counseling and lodged an informal complaint. Plaintiff remained in contact with Jennifer Magee ("Magee"), the EEO counselor assigned to his case, and at some point in late June 2011, Magee notified the Durham VAMC[2] of Plaintiff's informal complaint.[3] Next, on June 24, 2011, Plaintiff received a Notice of Proposed Removal from Freeman, listing 10 different "Charges" detailing how Plaintiff failed to adequately perform regarding his position's critical elements of Customer Service, Recruitment, and Technical Advice and Assistant. (Ex. D7 to Freeman Decl. [Doc. #29-25].) Each separate charge was supported by between 1 and 13 "specifications," documenting particular incidents when Plaintiff did not meet relevant performance standards for the critical elements of Customer Service, Recruitment, and Technical Advice and Assistance. (Id.) The specifications indicated, among other concerns, Plaintiff's failure to timely respond to e-mails and failure to complete time-sensitive tasks promptly. Documentation of these incidents, in the form of e-mails and Reports of Contact, accompanied

_____

[2] Magee e-mailed Director Ralph Gigliotti a letter dated June 24, 2011, regarding Plaintiff's contact with the EEO's Office of Resolution Management. The record does not reveal the exact dates each employee and supervisor at the Durham VAMC became aware of Plaintiff's EEO communications.

[3] Although Plaintiff's summary judgment brief alludes to Plaintiff filing an EEO complaint on June 6, no evidence in the record supports such a contention. The facts do indicate Plaintiff initiated contact with the EEO counselor in early June, but the only formal EEO complaint in the record is dated September 19, 2011.

the letter. Most of the documented instances happened during the period of March through May of 2011. Although the Proposed Removal letter invited Plaintiff to respond within 14 business days, Plaintiff initially elected not to do so. Plaintiff, however, did later supply some evidence of his experiencing computer difficulties during July 2011, including an inability to access certain archived e-mails and troubles logging on to his computer.

On August 3, 2011, Plaintiff was notified by letter from Ralph T. Gigliotti, Director of the Durham VAMC ("Gigliotti"), that a decision was made to remove Plaintiff from his position effective August 12, 2011. The letter listed the 10 Charges from the Proposed Removal letter as reasons supporting the decision to remove Plaintiff. The removal letter also noted that Plaintiff "did not provide an oral or written response" to the earlier proposal of removal as was suggested. (Ex. D22 to Freeman Decl. [Doc. #29-40], at 1.) Subsequent to Gigliotti's letter, Plaintiff submitted a letter to Gigliotti and requested to meet with him about the removal decision. This meeting between Plaintiff and Gigliotti took place on August 25, 2011. On August 29, 2011, Gigliotti sent Plaintiff a letter upholding the initial removal decision. In the letter, Gigliotti also acknowledged that he had reviewed "additional information [Plaintiff] provided with reference to the Proposed Removal dated June 24, 2011 and the Removal Decision dated August 3, 2011." (Ex. D25 to Freeman Decl. [Doc. #29-43].)[4]

Plaintiff thereafter filed a formal Equal Employment Opportunity Commission ("EEOC") complaint with the Merit Systems Protection Board ("MSPB") on September 12,

_____

[4]While not entirely clear from the record, the additional information referenced in the August 29 letter appears to be Plaintiff's updated medical records regarding his disability. (See Pl.'s Summ. J. Mem. [Doc. #34], at 6.)

2011, asserting his claims of disability discrimination. On March 31, 2012, the MSPB affirmed the Durham VAMC's removal action against Plaintiff.[5] On June 20, 2012, Plaintiff appealed the MSPB decision to the EEOC Office of Federal Operations. The Office of Federal Operations affirmed the MSPB's decision on October 4, 2012. Plaintiff then commenced the present action by filing his Complaint on November 5, 2012 [Doc. #2], and his Amended Complaint on July 26, 2013 [Doc. #13], asserting claims of disability discrimination based on violations of the Americans with Disabilities Act[6] ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C.§ 701 *et seq.*

## II.    LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp.

---

[5]The MSPB subsequently filed an Erratum on April 4, 2012, correcting minor errors in the initial March 31, 2012 decision.

[6]Although Plaintiff's Amended Complaint alleged claims under both the ADA and the Rehabilitation Act, the federal government is exempt from suit under the ADA. See 42 U.S.C. § 12111(5)(B)(i). Thus, a federal employee may bring a disability discrimination claim only under the Rehabilitation Act. Nonetheless, the Rehabilitation Act, and in turn, relevant case law, incorporates large swaths of ADA law and provisions. See 29 U.S.C. § 791(f); Baird ex rel Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999). While Plaintiff continuously references the ADA in his Motion for Summary Judgment, the Court will assume that Plaintiff intended these arguments to pertain to his claims under the Rehabilitation Act. To the extent Plaintiff intended to maintain a claim under the ADA, such a claim is subject to dismissal, and Defendant's Motion for Summary Judgment will be granted on any such ADA claim.

v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate the presence of a genuine issue of material fact which requires trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1349, 89 L. Ed. 2d 538 (1986).

When making a summary judgment determination, the court must view the evidence and all justifiable inferences from the evidence in the light most favorable to the non-moving party.  Zahodnick, 135 F.3d at 913.  However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration."  Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The court may not make credibility determinations, and "must disregard all evidence favorable to the moving party . . . that a jury would not be required to believe."  Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 436 (4th Cir. 2001).

III.   DISCUSSION

Plaintiff's Amended Complaint asserted two main claims.  First, Plaintiff contended that Defendant discriminated against him on account of his disability by refusing to provide him with reasonable accommodations.  Second, Plaintiff claimed that Defendant retaliated against him based upon his filing of an EEOC complaint by terminating his employment.  Both parties argue that summary judgment is proper because no genuine issue of material fact remains as to the assertions made by either party.  However, in response to Plaintiff's motion, Defendant raises

procedural arguments regarding Plaintiff's motion to the extent that it fails to comply with this Court's Local Rules. The Court begins by considering Defendant's procedural arguments before turning to the merits of Plaintiff's claims.

A.      Plaintiff's Failure to Comply with Local Rules

Defendant contends that the Court should not consider Plaintiff's Motion for Summary Judgment because of Plaintiff's noncompliance with the Local Rules in three main respects. As a preliminary matter, the Court notes that the *pro se* status of Plaintiff creates some tension in stringently applying the Local Rules. <u>E.g.</u> <u>Sinclair v. Mobile 360, Inc.</u>, 417 Fed. Appx. 235, 243 (4th Cir. 2011) (unpublished); <u>Alexander v. City of Greensboro</u>, No. 1:09-CV-00293, No. 1:09-CV-00934, 2013 U.S. Dist. LEXIS 177336, at *51–52 (M.D.N.C. Dec. 18, 2013) (considering *pro se* brief that violated several Local Rules because "the court has a strong interest in resolving [plaintiffs' claims] rather than delay their resolution further because of the missteps of [the *pro se* plaintiffs]"); <u>Hill v. Equifax Info. Servs., LLC</u>, 974 F. Supp. 2d 865, 868 (M.D.N.C. 2013) (recognizing "court's duty to construe pro se pleadings liberally" in context of summary judgment motion). Defendant argues Plaintiff failed to adhere to the Local Rules regarding the timing, page length, and cited support for his motion. Each issue is considered in turn.

1.      Timing of Plaintiff's Motion for Summary Judgment

As highlighted by Defendant, Local Rule 56.1 requires parties to provide notice of intent to file a dispositive motion—including a motion for summary judgment—"within 14 days following the close of the discovery period," and in turn, the motion itself and any supporting memoranda "must be filed and served within 30 days following the close of the discovery

period." LR 56.1(a)-(b). A party responding to a motion for summary judgment must file its response to the motion within 30 days after service of the motion. LR 56.1(d); LR 7.3(f). In the present matter, discovery closed on March 15, 2014. Thus, Plaintiff's filing of his Summary Judgment Motion on May 19, 2014, was untimely as being filed more than 30 days after the close of discovery.

A court may, however, in its discretion, consider an untimely summary judgment motion. E.g. Ward v. Maloney, No. 1:02CV00467, 2004 U.S. Dist. LEXIS 10981, at *1 n.1 (M.D.N.C. June 14, 2004). Local Rule 56.1(g) provides that an untimely summary judgment motion "will not be reached by the Court prior to trial unless the Court determines that its consideration will not cause delay to the proceedings." LR 56.1(g) "[T]he determination is . . . an equitable one, taking account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice [to the adverse party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498, 123 L. Ed. 2d 74 (1993); see Morris-Belcher v. Hous. Auth. of Winston-Salem, No. 1:04CV255, 2005 U.S. Dist. Lexis 48145, at *10-11 (M.D.N.C. June 17, 2005).

Insomuch as the issues raised by Plaintiff's Motion for Summary Judgment are largely the same as those raised by Defendant's Motion for Summary Judgment, this Court has determined that consideration of Plaintiff's Motion for Summary Judgment will not cause delay to the proceedings. See Ward, 2004 U.S. Dist. LEXIS 10981, at *1 n.1; Pless v. Watkins, No. 1:12-CV-

94, 2013 U.S. Dist. LEXIS 84384, at *3–4 (M.D.N.C. June 17, 2013) ("Even in the absence of a good excuse for the untimely [summary judgment] motion, the Court concludes that under the circumstances of this case, refusal to rule on the motion is not required."); <u>Melton v. Freeland</u>, 1997 U.S. Dist. LEXIS 23118, at *2 (M.D.N.C. March 26, 1997). As such, the Court finds that the untimeliness of Plaintiff's motion does not prevent the Court from considering the merits of said motion.

### 2. Plaintiff's 30-Page Summary Judgment Filing

Defendant further asserts that the Court should not consider Plaintiff's brief because it is ten-pages over the page limit proscribed by the Local Rules. Local Rule 56.1 expressly incorporates the page limitation requirements of Local Rule 7.3(d), so that principal briefs on a summary judgment motion may not exceed 20 pages and reply briefs may not exceed 10 pages. The Court observes that to the extent Defendant was able to and did respond to Plaintiff's untimely, over-length brief, Defendant does not appear to have been, nor does Defendant argue that, it was prejudiced by Plaintiff's noncompliance with the Local Rules. The Court further recognizes Plaintiff's *pro se* status, and the purpose of the Local Rules to "foster civility in the practice of law before this Court, and to promote the just and prompt determination of all proceedings." LR 1.1; <u>see also</u> <u>Alexander</u>, 2013 U.S. Dist. LEXIS 177336, at *51–52 (considering *pro se* plaintiffs' 68-page response brief). With these observations in mind, and again noting that the issues raised by both parties' motions are largely the same, the Court will consider Plaintiff's over-length brief in its entirety.

### 3. Plaintiff's Citations to Materials Not in the Record

Defendant's final contention regarding Plaintiff's noncompliance with the Local Rules is that Plaintiff failed to attach documents referenced in his brief, in contravention of LR 7.3(e)'s mandate that "[w]hen allegations of facts not appearing of record are relied upon to support a motion, affidavits, parts of depositions, and other pertinent documents then available shall accompany the motion." L.R. 7.3(e). As is necessary in considering motions for summary judgment, the Court will only consider those facts in the record which are supported by admissible evidence. Thus, to the extent Plaintiff cited material not in the record, the Court will not consider corresponding statements to be supported by fact unless supported by other evidence which is in the record.

Although the Court will consider the portions of Plaintiff's untimely, over-length brief which are supported by facts of record, the Court stresses the importance of compliance with the Local Rules and admonishes Plaintiff to review the rules and carefully adhere to them in any future dealings he might have with the Middle District of North Carolina. Thus determining that the equities of the present matter favor consideration of Plaintiff's Motion for Summary Judgment as discussed above, the Court next turns to the merits of the parties' respective motions.

B.     Discrimination Based on Failure to Accommodate

Plaintiff's Amended Complaint generally alleged that Defendant discriminated against Plaintiff on account of his disability. Plaintiff specifically contended that the Durham VAMC discriminated against him by denying his request for reasonable accommodation. While Plaintiff asserts he has established such a prima facie discrimination claim, Defendant contends that the

undisputed facts demonstrate that Plaintiff has not met this burden and Defendant is accordingly entitled to judgment as a matter of law.

1.  Elements for a Prima Facie Disability Discrimination Claim

The Rehabilitation Act prohibits discrimination by "any Executive agency" on the basis of disability. 29 U.S.C. § 794(a). The Rehabilitation Act expressly incorporates the definitions and standards utilized by the ADA in assessing a claim for disability discrimination. See 29 U.S.C. § 791(f); Baird, 192 F.3d at 468. The ADA provides that disability discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). Thus, a prima facie claim of disability discrimination for failure to accommodate is established when a plaintiff shows (1) he is disabled within the meaning of the ADA or Rehabilitation Act, (2) his employer was aware of the disability, (3) the plaintiff was a qualified individual who could perform the essential functions of his position with or without accommodation, and (4) his employer failed to provide such reasonable accommodations. E.g. Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citing Mitchell v. Washingtonville, 190 F.3d 1, 6 (2d Cir. 1998)) However, even if the plaintiff successfully establishes each of these elements, the employer-defendant may prevail if the accommodation would impose an undue hardship on the employer. U.S. Airways v. Barnett, 535 U.S. 391, 402, 122 S. Ct. 1516, 1523, 152 L. Ed. 2d 589 (2002); 29 CFR § 1630.2(o)(4).

Defendant primarily argues that Plaintiff's disability discrimination claim must fail because

Plaintiff cannot show that he was a qualified individual who could perform the essential functions of his position. If Defendant is correct and Plaintiff has not met his burden of proof on this element, then the Court need not consider the remaining elements for a prima facie case of disability discrimination. Thus, in analyzing Plaintiff's disability discrimination claim, the Court turns first to whether or not a genuine issue of material fact exists regarding Plaintiff's potential status as a qualified individual within the meaning of the Rehabilitation Act, and in turn, whether either party is entitled to judgment as a matter of law on this matter.

2.      Qualified Individual Status Element

To be a qualified individual with a disability, an individual must "satisf[y] the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds . . . and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); see 42 U.S.C. § 12111(8); Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 462 (4th Cir. 2012). Thus, the qualified individual element of a disability discrimination claim is comprised of two considerations: "(1) [W]hether [the plaintiff] could 'perform the essential functions of the job, . . .' and (2) if not, whether 'any reasonable accommodation by the employer would enable [the plaintiff] to perform those functions.'" Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994) (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993)); Myers v. Hose, 50 F.3d 278, 281-82 (4th Cir. 1995); see also Halpern, 669 F.3d at 462 (employing same two-prong standard for establishing qualified individual status). The plaintiff bears the burden of providing sufficient evidence to establish his qualified status. Halpern, 669 F.3d at 462 (citing Tyndall, 31 F.3d at 213). In order

to satisfy this element of a prima facie disability discrimination claim, Plaintiff must show that he either is qualified without accommodation, or that he could be qualified with accommodation.

a.　　　"Otherwise Qualified" Without Accommodation

Under the Rehabilitation Act, "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Cmty. College v. Davis, 442 U.S. 397, 406, 99 S. Ct. 2361, 2367, 60 L. Ed. 2d 980 (1979); 29 U.S.C. § 794(a) (prohibiting discrimination against an "otherwise qualified individual with a disability"). For Plaintiff to establish that he was "otherwise qualified" for his HR Specialist position, he must show that he could, without accommodation, "perform the essential functions of the . . . position." 42 U.S.C. § 12111(8). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Functions are essential if they "bear more than a marginal relationship to the job at issue." Tyndall, 31 F.3d at 213. Federal regulations provide a nonexhaustive list of reasons a job function might be essential:

> (i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2). The regulations also enumerate a nonexhaustive list of kinds of evidence which may indicate whether a function is essential:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii)

The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

Id. § 1630.2(n)(3).

In the present matter, Defendant highlights the Durham VAMC's "performance elements" and corresponding "performance standards" for Plaintiff's HR Specialist position as evidence of the essential functions of the position. According to the Department of Veterans Affairs, "[a]n element is defined as a component of a position that is sufficiently important to warrant written appraisal." (Ex. E1A to Leach Decl. [Doc. #30-2], at 1.) Thus, elements represent key responsibilities associated with a particular position. In turn, each element is further defined by performance standards which set out specific requirements that an employee must meet in order to be performing successfully in his position. Several of the standards for the HR Specialist position mandate particular response or completion times for certain tasks, such as responding to an e-mail within 24 hours, or initiating recruitment within 5 business days of authorization for the position.

The undisputed facts establish that the essential functions of the HR Specialist Position include the three elements of Customer Service, Recruitment, and Technical Advice and Assistance. Plaintiff does not appear to dispute that the elements and performance standards describe essential functions of the HR Specialist Position. Plaintiff was well-aware of these standards, which were presented in performance review documents signed by Plaintiff in May and December of 2010. Moreover, Plaintiff was reminded of the performance standards for the

elements of Customer Service, Recruitment, and Technical Advice and Assistance when he was placed on the PIP on August 9, 2010.

As reviewed above, the undisputed facts establish Plaintiff's poor performance regarding these three elements in early 2011, and the record provides multiple specific instances where Plaintiff's performance fell below his employer's standards.[7] Plaintiff attributes his deficiencies to changes in his workload and a new computer staffing program launched during that time period. Plaintiff highlights his past positive performance reviews and his successful completion of the PIP as evidence that Plaintiff could perform the essential functions of the HR Specialist position. However, that Plaintiff successfully performed his responsibilities during a past time period does not nullify inadequate performance during the more recent time period in question. Cf. Myers, 50 F.3d at 283 (determining that qualified individual status depends on the individual's present ability, not the possibility of future ability, to perform essential functions). Moreover, while Plaintiff's satisfactory completion of the PIP suggests he could perform adequately, the fact that he was placed on the PIP in the first place indicates that Plaintiff had struggled in his position prior to 2011, and prior to the roll-out of the new staffing program and the increase to his workload because of Cobb's departure.

The Court finds that there is no genuine dispute of fact as to Plaintiff's documented unsatisfactory performance in early 2011. In fact, Plaintiff's inability to meet several performance standards for his position in early 2011 demonstrates that Plaintiff could not "perform the

---

[7] In an August 9, 2011 letter to Gigliotti, Plaintiff attempted to explain some of these specific instances by suggesting another employee or department was at fault. However, with regards to the present motions, Plaintiff did not provide any evidence to support his allegations that others were the cause of his poor performance evaluations.

essential functions . . . of the position." 42 U.S.C. § 12111(8). Thus, Plaintiff was not otherwise qualified for the HR Specialist Position absent an accommodation. Accordingly, the Court next considers whether Plaintiff could be qualified by being provided a reasonable accommodation.

b. Qualified with Reasonable Accommodation

Because the Court has determined that Plaintiff was not able to fulfill the essential functions of the HR Specialist position without accommodation, he must show that reasonable accommodations would have enabled him to perform the essential functions in order to be a qualified individual for purposes of the Rehabilitation Act. "Even if a person is unable to perform the essential functions of the job in question, 'a court must nevertheless determine whether the person could do the job with reasonable accommodation.'" Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997) (quoting Myers, 50 F.3d at 281-82); see 42 U.S.C. § 12111(8). Importantly, this requires showing not that the employee could perform the essential functions of the job with any accommodation, but instead that the employee could perform the essential functions with a reasonable accommodation.

The ADA defines the term "reasonable accommodation" as including, in relevant part, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The corresponding regulations provide a similar nonexhaustive list of possible reasonable accommodations. See 29 C.F.R. § 1630.2(o)(2). As is relevant here, the regulations also define

reasonable accommodation as meaning "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." Id. § 1630.2(o)(1)(ii).

To survive a defendant's motion for summary judgment, a plaintiff must establish that an accommodation is facially reasonable, in that the accommodation is reasonable "ordinarily or in the run of cases." Barnett, 535 U.S. at 401-02; 122 S. Ct. at 1523, 152 L. Ed. 2d 589. "To show that an accommodation is reasonable, a plaintiff must show that the accommodation on its face will be feasible for the employer." Hendrix v. AT&T, No. 3:09-cv-2174-CMC-PJG, 2011 U.S. Dist. LEXIS 60566, at *12 (D.S.C. June 6, 2011). If the plaintiff makes this preliminary showing, the burden then shifts to the defendant to establish that the accommodation imposes an undue hardship. Barnett, 535 U.S. at 402; 122 S. Ct. at 1523, 152 L. Ed. 2d 589.

In the present matter, Plaintiff made only broad, unspecific requests for accommodation. Plaintiff did not elaborate beyond his generic requests for (1) "Change Performance Standards," (2) "Modify Workload," and (3) "Assistant." (Ex. D6 to Freeman Decl. [Doc. #29-24], at 2.) In his arguments on the present motions, Plaintiff contends that his testimony at the MSPB hearing clarified his requested accommodations, particularly the change in performance standards, as boiling down to Plaintiff "really requesting that they . . . give me an assistant and also assist with the workload because I had more work than I thought I could manage," and more time to complete his work. (Pl.'s Summ. J. Mem. [Doc. #34], at 16; MSPB Hr'g Tr. [Doc. #36], at 21.) Even with this clarification, Plaintiff's requested accommodations remain generic and

without sufficient explanation to indicate that they are facially reasonable. The broad nature of Plaintiff's requests makes it more difficult for Plaintiff to show that such requests are reasonable "ordinarily or in the run of cases." See Barnett, 535 U.S. at 401-02; 122 S. Ct. at 1523, 152 L. Ed. 2d 589.

Indeed, to the extent Plaintiff was effectively requesting a change in his performance standards or reduced stress from his job demands, courts have routinely held that such a change is not a reasonable accommodation. E.g. Lucas v. W. W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001) ("[E]mployers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists."); Wells v. BAE Sys. Norfolk Ship Repair, 483 F. Supp. 2d 497, 509-10 (E.D. Va. 2007), aff'd, 250 Fed. Appx. 552 (4th Cir. 2007) (employer not required to eliminate specific job duties of position); Anderson v. Arizona, No. CV06-00817-PHX-NVW, 2007 U.S. Dist. LEXIS 36399, at *19-20 (D. Ariz. May 15, 2007) (finding a request for a reduced workload beyond the position's minimum workload requirement to be "inherently unreasonable"); Carozza v. Howard Cnty., Md., 847 F. Supp. 365, 368, (D. Md. 1994), aff'd, 45 F.3d 425 (4th Cir. 1995) (holding Rehabilitation Act does not require "an employer so to 'restructure' a job as to change its fundamental requirements, such as the ability to cope with its inherent stressors"). Here, Plaintiff has not provided any evidence to indicate that a general, unspecified change in his performance standards, as he requested, is a reasonable request.[8] In fact, Plaintiff almost concedes the impossibility of such a claim in his

_____

[8] The Court acknowledges and has reviewed Plaintiff's medical documentation from August 2011 documenting his disability. The Neuropsychological Evaluation concluded with "accommodations [that] appear appropriate," including that Plaintiff "may require additional time to complete written assignments [and] . . . repetition in order to learn new information in

briefing on the matter by stating, "[a]lthough the agency has no obligation to change its performance standards, it does have an obligation to discuss with Plaintiff what accommodations he is seeking . . . ." (Pl.'s Summ. J. Mem. [Doc. #34], at 15).

Similarly, with regards to his request for an accommodation in the form of an assistant, presumably to perform his work, case law establishes that employers are not required to hire another employee in order to accommodate a disabled employee. Bratten v. SSI Servs., Inc., 185 F.3d 625, 632 (6th Cir. 1999); e.g. Martinson, 104 F.3d at 687 ("The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position." (citing 29 C.F.R. Pt. 130, App. at § 1630.2(o))); Hendrix, 2011 U.S. Dist. LEXIS 60566, at *14 ("[T]he ADA does not require an employer to permit an additional person permanently to perform an essential function of a disabled employee's position."); E.E.O.C. v. Dollar Gen. Corp., 252 F. Supp. 2d 277, 291 (M.D.N.C. 2003) (holding that "a full-time job coach providing more than training cannot be a reasonable accommodation"). Plaintiff provides no evidence to counsel a contrary conclusion here. Moreover, with regards to both his request

---

a work setting." (Attach. to Pl.'s Summ. J. Mem. [Doc. #35], at 31.) The doctor also specifically noted that Plaintiff "should be provided an HR assistant on an as needed basis," recommended "[m]odification of [Plaintiff's] performance standards," and suggested assigning Plaintiff to "a different position, for example patient advocate or chaplain services." (Id.) Defendant attacks the credibility of these recommendations, questioning how a psychiatrist would know specific terms like "HR assistant." The Court notes that such an attack is a matter of credibility, which would be a determination for a jury and not this Court on Summary Judgment. However, in viewing this evidence in the light most favorable to Plaintiff, the Court further notes that this evidence does not demonstrate that such accommodations are reasonable or feasible for the employer. These statements do not indicate that such recommendations would enable Plaintiff to perform the essential functions of the HR Specialist position. Thus, while the evidence may state Plaintiff's doctor's recommendations or needs, the evidence does not go to reasonableness.

for an assistant and to change his performance standards, Plaintiff did not show how such accommodations would enable him to perform the essential functions of his position. In contrast, Defendant has effectively demonstrated that Plaintiff's requests would instead eliminate an essential function of his position, which in turn renders the accommodation unreasonable. See Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 287 n.17, 107 S. Ct. 1123, 1131 n.17, 94 L. Ed. 2d 307 (1987). Accordingly, Plaintiff's requests for an assistant and for a change in his performance standards are not facially reasonable.

Finally, Plaintiff has not established that his ambiguous request to modify his workload was facially reasonable. As identified above, the ADA and the statute's implementing regulations include modifications to an employee's work position as a possible reasonable accommodation. See 42 U.S.C. § 12111(9); id. § 1630.2(o)(1)(ii). However, Plaintiff's request to "Modify Workload" lacks specificity, which makes analyzing the feasibility of such a request more difficult. (Ex. D6 to Freeman Decl. [Doc. 29-24], at 2.) Plaintiff's testimony at the MSPB hearing suggests that Plaintiff's request for a modified workload was ultimately a request for more time to complete assignments and a reduced workload because he "had more work than [he] thought [he] could manage." (Pl.'s Summ. J. Mem. [Doc. #34], at 16; MSPB Hr'g Tr. [Doc. #36], at 21.) As discussed above, such a request is inherently unreasonable in that it would eliminate essential functions of the position. Ultimately, Plaintiff's lack of particularity and failure to show that this request is feasible dooms such a request.

Instead of pointing to evidence indicating how modifying his workload might be reasonable, Plaintiff asserts that Defendant was obligated to discuss with Plaintiff what his

requests actually meant. While it is true that the employer should engage in an interactive process with the employee requesting a reasonable accommodation, "a plaintiff must show that a reasonable accommodation existed before a court may find that an employer's purported failure to engage in an interactive process was unlawful." Vannoy v. FRB of Richmond, No. 3:13-cv-797-JAG, 2014 U.S. Dist. LEXIS 161578, at *12 (E.D. Va. Nov. 17, 2014); see also Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011). Moreover, the record reflects that Defendant did engage in an interactive process. EEO Manager Wright discussed Plaintiff's request with him, including considering additional accommodations that might be applicable. Plaintiff indicated his unwillingness to consider relocating or a position at a lower salary grade, and his expression of an accommodation based upon his interest in reassignment to a Chaplain or Patient Advocate position was infeasible because no such vacant positions were available. The undisputed facts illustrate that Defendant adequately engaged in the interactive process and that Plaintiff did not meet his burden to show that his general request for a modified workload was reasonable.

In sum, Defendant could not change Plaintiff's performance standards, provide him with an assistant, or modify his workload without altering the fundamental functions of the HR Specialist Position. To do so would also compromise the efficient operation of the Durham VAMC. See Rehrs v. Iams Co., 486 F.3d 353, 358 (8th Cir. 2007); Myers, 50 F.3d at 283 ("... Congress clearly meant to avoid placing employers in an untenable business position."). The undisputed facts demonstrate that modifying Plaintiff's workload, including a reduction in work or an extension of time to complete assignments, would result in an alteration or

elimination of an essential function of Plaintiff's position. The Rehabilitation Act and ADA do not mandate such a result. "Defendant was not required to exempt Plaintiff from an essential function of the position in order to accommodate him." Hill v. Southeastern Freight Lines, Inc., 877 F. Supp. 2d 375, 392 (M.D.N.C. 2012) aff'd, 523 Fed. Appx. 213 (4th Cir. Apr. 15, 2013) (citing Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 850 (6th Cir. 1998)); Crabill, 423 Fed. Appx. at 323; 29 C.F.R. Pt. 1630, App. at § 1630.2(o). Because Plaintiff has not shown that he was a qualified individual who, even with reasonable accommodation, could perform the duties of HR Specialist, he cannot establish a prima facie case of disability discrimination under the Rehabilitation Act. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's claim of disability discrimination.

C.     Retaliation

Plaintiff contends that his employment was terminated in retaliation for filing an EEOC Complaint.[9] "To establish a prima facie case of retaliation, an employee must show: (1) that the employee engaged in protected activity; (2) that the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the

---

[9]It is not clear from Plaintiff's Complaint and Amended Complaint whether Plaintiff intended to also specifically claim that his termination of employment was a form of unlawful disability discrimination. The elements of such a claim under the Rehabilitation Act are (1) the employee was a qualified individual with a disability, (2) his employment was terminated, (3) the employee was meeting his employer's legitimate performance expectations at the time of his discharge, and (4) the employee was terminated solely because of his disability. E.g. Coursey v. Univ. of Md. E. Shore, 577 Fed. Appx. 167, 174 (4th Cir. Mar. 20, 2014) (unpublished). As discussed above, Plaintiff is not a qualified individual within the meaning of the Rehabilitation Act, and his performance did not meet his employer's legitimate expectations at the time of his termination. As such, to the extent Plaintiff intended to claim his termination of employment was discriminatory, Defendant would be entitled to judgment as a matter of law on any such claim.

adverse action." <u>Newby v. Whitman</u>, 340 F. Supp. 2d 637, 660 (M.D.N.C. 2004); <u>see also</u> <u>Coleman v. Md. Court of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010) (identifying elements of retaliation claim in context of Title VII); <u>Wimbush v. Donahoe</u>, No. 1:09CV00358, 2012 U.S. Dist. LEXIS 33388, at *35-36 (M.D.N.C. Mar. 13, 2012) (noting that a retaliation claim is analyzed in the same manner under Title VII and the Rehabilitation Act). A plaintiff without direct evidence of retaliation may employ the burden-shifting framework of <u>McDonnell Douglas</u> <u>Corp v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). <u>See</u> <u>Price v. Thompson</u>, 380 F.3d 209, 212 (4th Cir. 2004). Under the <u>McDonnell Douglas</u> framework, if the plaintiff successfully establishes a prima facie case of retaliation, "the burden then shifts to the employer to establish a legitimate non-retaliatory reason for the action." <u>Id.</u> In turn, if the employer provides such a legitimate reason, the burden shifts back to the plaintiff to establish that "the employer's proffered reasons are pretextual." <u>Id.</u> At the end of the back-and-forth burden-shifting, the plaintiff must ultimately prove that the protected activity was the but-for cause for the adverse action. <u>Univ. Tex. Southwest Med. Ctr. v. Nassar</u>; 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013); <u>Bell v. Shinseki</u>, No. 13-1890, 2014 U.S. App. LEXIS 17775, at *3-4 (4th Cir. Sept. 16, 2014) (unpublished); <u>Staley v. Gruenberg</u>, 575 Fed. Appx. 153, 156 (4th Cir. May 30, 2014); <u>Childs-Bey v. Mayor of Baltimore</u>, No. TJS-10-2835, 2013 U.S. Dist. LEXIS 149275, at *5-6, *12-15 (D. Md. Oct. 17, 2013).

 In the present action, Plaintiff has not met his ultimate burden of showing that he engaged in any protected activity which could be considered a but-for cause for the eventual termination of his employment. Defendant responds to Plaintiff's claim by asserting that Plaintiff's

termination was due to Plaintiff's poor performance record, beginning with his late-2010 PIP and continuing in early 2011. As discussed above, Defendant has provided ample evidence of Plaintiff's unsatisfactory performance in the realms of Customer Service, Technical Advice and Support, and Recruitment. Notably, these documented instances of poor performance occurred prior to Plaintiff's request for reasonable accommodation and prior to his initial contact with the EEOC.

Plaintiff nevertheless relies on what he contends is a "strong temporal connection" between his contact with the EEOC and his Proposed Removal. (Pl.'s Summ. J. Mem. [Doc. #34], at 27.) Plaintiff contends that this alleged temporal connection is sufficient to satisfy the necessary causation element. However, "Plaintiff cannot rely on temporal proximity alone to establish pretext." Shoaf v. Kimberly-Clark Corp., 294 F. Supp. 2d 246, 758 (M.D.N.C. 2003). Moreover, such a temporal connection is insufficient to show that but for Plaintiff's protected actions, he would not have lost his job. Staley, 575 Fed. Appx. at 156 ("Although Staley's non-conversion occurred shortly after she filed the formal EEOC complaint, this temporal proximity alone is not sufficient to establish that her engagement in protected activity was a 'but for' cause of her non-conversion."); see Bell, 2014 U.S. App. LEXIS 17775, at *3-4.

Defendant, on the other hand, has identified and offered supporting evidence for a legitimate, non-retaliatory reason for Plaintiff's removal, namely, Plaintiff's documented inability to satisfactorily fulfill essential functions of his position. Even in viewing the evidence in the light most favorable to Plaintiff, the undisputed facts do not establish that Defendant's proffered reason is mere pretext. Because Plaintiff has not shown that he would not have been removed

from his HR Specialist position but for his actions requesting reasonable accommodation and contacting the EEO counselor, Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

IV.     CONCLUSION

For the reasons stated above, Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims.   Accordingly, the Court will grant Defendant's Motion for Summary Judgment [Doc. #28] and deny Plaintiff's Motion for Summary Judgment [Doc. #33].

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED, and Plaintiff's Motion for Summary Judgment is hereby DENIED.  To the extent Plaintiff may have intended to bring a disability discrimination claim based on his termination, Defendant's Motion for Summary Judgment is GRANTED as to such a claim, and Plaintiff's Motion for Summary Judgment is DENIED as to such a claim.  IT IS FURTHER ORDERED that to the extent Plaintiff intended to assert claims specifically under the ADA such claims are hereby DISMISSED.   A Judgment consistent with this Memorandum Opinion and Order will be filed contemporaneously herewith.

This the 15th day of December, 2014.

United States District Judge